IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. |
| v. | ) | |
| | ) | **UNDER SEAL** |
| JAMES PIERCE | ) | |

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

Gregory S. Fine, being duly sworn, states that he is a Special Agent with the Federal Bureau of Investigation ("FBI").

Upon information and belief, in or about and between February 2011 and October 2013, both dates being approximate and inclusive, within the District of Columbia and elsewhere, the defendant JAMES PIERCE, together with others, did knowingly and intentionally conspire to commit an offense against the United States, that is, to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Section 1343.

In furtherance of the conspiracy, the defendant and his co-conspirators committed the following overt act, among others, in the District of Columbia and elsewhere: On August 1, 2013, co-conspirator MM sent a bank transfer of $50,000 to PIERCE, causing an electronic wire communication in interstate and foreign commerce.

(Title 18, United States Code, Section 371.)

1

## INTRODUCTION

The source of your affiant's information and the grounds for his belief are as follows:

1.       I am a Special Agent of the Federal Bureau of Investigation (FBI).  I have been with the FBI since 2006.  I am currently assigned to the Washington Field Office of the FBI in Manassas, Virginia to investigate complex financial crimes.  Since joining the FBI, I have received training in general law enforcement and criminal investigations, and I have participated in investigations involving financial fraud and other criminal activity, including conspiracy and wire fraud.

2.       I was recently assigned to this investigation, but I have knowledge of the information contained in this affidavit from: a) discussions with another FBI Special Agent assigned to the investigation, Jeffrey Weeks; b) my review of certain documents referenced in this affidavit; and c) my review of reports of interviews prepared by law enforcement agents involved in this investigation.

3.       Special Agent Weeks has been an FBI Special Agent since April 2005, and is currently assigned to a complex financial crimes squad at the Washington Field Office of the FBI in Manassas, Virginia.  His involvement in this investigation has included interviewing victims and other witnesses, reviewing financial and other records provided to him by numerous financial institutions and other entities, and reviewing reports of interviews prepared by other law enforcement agents involved in this investigation.  He has also reviewed numerous e-mails sent to or from accounts belonging to the defendant, including emails obtained pursuant to a search warrant of his co-conspirator MM's account authorized on April 12, 2017 by U.S. Magistrate

Judge Deborah A. Robinson of the United States District Court for the District of Columbia.[1]  He

has also spoken with MM, who has admitted his involvement in the scheme to defraud.  MM

pleaded guilty to one count of 18 U.S.C. § 1343 (wire fraud) as described below, and is hoping to

receive a benefit from cooperating with the government in the form of a sentencing reduction.

4.      Except as explicitly set forth below, I have not distinguished in this affidavit

between facts of which I have personal knowledge and facts of which I learned from other law

enforcement agents.  Because this affidavit is limited in purpose, I am not including all facts known

to law enforcement concerning this investigation.  Instead, I have set forth only those facts that I

believe are necessary to establish probable cause for the arrest warrant sought herein.  In addition,

where the contents of documents, or the actions, statements and conversations of others are

reported herein, they are reported in sum and substance and in part, except where otherwise

indicated.

## PROBABLE CAUSE

### I.   Overview of the Conspiracy

5.      From at least in or about February 2011 and continuing until at least in or about

October 2013, the defendant JAMES PIERCE, together with his co-conspirator MM and others,

defrauded victims by telling them that, in exchange for an upfront payment, the co-conspirators

would arrange for Bank 1 to issue SWIFT messages showing that the victims had access to funds

on deposit at Bank 1.  As part of their pitch and at PIERCE's direction, the co-conspirators

represented that they had access to funds at Bank 1.  In fact, the co-conspirators neither controlled

accounts at Bank 1 nor had the ability to cause Bank 1 to issue the SWIFT messages they promised

---

[1] Judge Robinson also authorized a search warrant of the defendant's e-mail account on July 10, 2017, but the execution of that warrant did not return any e-mails.

to the victims.  Instead, PIERCE and his co-conspirators provided victims with fake SWIFT messages that purported to show that Bank 1 had issued SWIFT messages as promised.  After the victims confronted PIERCE and MM, who had failed to follow through on their promises, they offered a number of excuses and false statements, including that Bank 1 had in fact sent the SWIFT messages and that the receiving banks had confirmed their receipt.  PIERCE and MM also attempted to discourage the victims from contacting Bank 1 directly, in order to conceal the conspiracy.

## II.  Relevant Individuals and Entities

6.     Defendant JAMES PIERCE was a resident of Texas.  He represented that he had expertise in providing bank information that would show that a person had sufficient credit to finance large commercial transactions.  The email accounts jp@jpierceinvestments.com and james@jpierceinvestments.com, among others, belonged to defendant PIERCE.

7.     MM was a resident of Washington, D.C.  On June 5, 2018, MM entered a plea of guilty to one count of wire fraud, in violation of 18 U.S.C. § 1343, in the United States District Court for the Middle District of Florida, in relation to his involvement with the scheme described herein.

8.     CC-1 was a resident of Florida.

9.     Bank 1 was a bank located in the Dominican Republic.

10.    Victim A was a resident of California.

11.    Victim B was the owner of Company B.  Company B was registered and incorporated in Florida in 2010, and its business was located in Naples, Florida.  Company B was created by Victim B in June 2010 for the purpose of trading futures and commodities.

12.     Victim C was the treasurer of Company C.  Company C was registered and incorporated in Nevada, and its business was located in Virginia.  Company C was created by Victim C and his partners in June 2013 for the purpose of pursuing business opportunities relating to the purchase and sale of oil and oil products.

13.     The Society for Worldwide Interbank Financial Telecommunication ("SWIFT") is a global member-owned cooperative and the world's leading provider of secure financial messaging services.  It is a network enabling financial institutions worldwide to send and receive information about financial transactions in a secure, standardized and reliable environment. SWIFT is headquartered in La Hulpe, Belgium.

**III.     Background Regarding SWIFT Transactions**

14.     One type of SWIFT message is the Message Type (MT)-760, which is a guarantee associated with a Standby Letter of Credit (SBLC).  An SBLC is a guarantee of payment issued by a bank on behalf of a client.  SBLCs are created as a sign of good faith in business transactions and are proof of a buyer's credit quality and repayment abilities.

15.     An MT-799 is a "Free Format" SWIFT message that a financial institution can use as a catch-all for communications that do not correspond with other standardized SWIFT messages.

**IV.     The Fraudulent Scheme**

<u>Victim A</u>

16.     FBI agents interviewed Victim A about his interactions with PIERCE, CC-1, and Broker A.  In or around February 2011, Broker A represented to Victim A that Victim A could earn a substantial fee from participating in the issuance of an SBLC to a third party that needed financing to engage in trading.  Broker A represented that by making a $350,000 payment to CC-

1, whom Broker A represented would serve as the escrow agent for the transaction, Victim A could cause Bank 1 to transmit an SBLC by SWIFT message to a bank of the third party, which the third party could use to obtain financing.

17.     Victim A made the $350,000 payment to CC-1.  Broker A then provided Victim A with a copy of what Broker A represented to be a copy of the SWIFT MT-760 message that Bank 1 transmitted to the third party's bank.  As part of the FBI's investigation, a Special Agent spoke with a representative of Bank 1.  The representative confirmed that the account names and the account numbers on the purported SWIFT MT-760 were not actual Bank 1 account names or numbers.  This indicates that the purported Bank 1 documentation was fraudulent.

18.     Victim A stated that he did not receive confirmation from the bank of the third party that it had received the SWIFT MT-760 message.  PIERCE then contacted Victim A. PIERCE stated that Victim A should bypass Broker A and speak directly with PIERCE because PIERCE was the person who had direct contact with Bank 1.  PIERCE maintained that Bank 1 had transmitted the SBLC and that any mistake with the transaction must be due to the failure of the third party's bank.

19.     Victim A informed PIERCE that it looked like PIERCE and the purported escrow agent, CC-1, were defrauding him, which PIERCE denied.

20.     On or about June 23, 2011, PIERCE forwarded Victim A a copy of an additional purported SWIFT message that Bank 1 had sent to the third party's bank in reference to the earlier purported Bank 1 SWIFT MT-760 message.  This additional purported message appeared to have been sent from Bank 1 to the third party's bank by a Bank 1 "Officer Trade" named Omar Guerrero with a Bank 1 employee ID number of 10729.  A representative of Bank 1, however, confirmed that it did not have an employee named Omar Guerrero.  The representative

of Bank 1 also stated that Bank 1 had terminated a similarly named Bank 1 employee several years earlier in 2006, and that the employee had a different Bank 1 ID number. This indicates that this message was also fraudulent.

21.     Victim A later reported the purported escrow agent CC-1 to the Florida Bar for the unauthorized practice of law. On or about October 18, 2013, PIERCE sent Victim A a draft affidavit in which PIERCE attempted to have Victim A release CC-1 from Victim A's claims with the Florida Bar. Later, after the Florida Bar interviewed CC-1, on or about November 22, 2013, Victim A received a refund of his payment.

MM

22.     A Special Agent interviewed MM, who stated that PIERCE recruited him into the scheme in 2012.[2] PIERCE told MM that he had connections at Bank 1 who could issue bank documentation via SWIFT message. PIERCE and MM then reached an arrangement in which MM would solicit new "clients," and PIERCE would provide the purported Bank 1 documentation to MM to give to them. MM would charge a victim client a fee for each Bank 1 "transaction." PIERCE and MM shared that fee, and according to MM, and the investigative team's review of bank records, MM sent a portion of the victim money to bank accounts controlled by PIERCE in Florida and Costa Rica. The FBI's review of bank records revealed that PIERCE then transferred a portion of the victim money to a bank account controlled by CC-1.[3]

---

[2] MM told the Special Agent that he had doubts about Pierce's transactions from the outset because of Pierce's requirement that neither MM nor the "clients" could contact Bank 1. Then once Victim B's first transaction failed (see below), MM knew that these transactions were fraudulent. MM stated that PIERCE did not acknowledge to him that the Bank 1 documentation was fraudulent.

[3] A representative of Bank 1 confirmed that Bank 1 had no relationship with CC-1. MM also stated that he did not know CC-1.

23.     MM further told the Special Agent that PIERCE instructed MM how to prepare documents for the fraudulent transactions, and provided him with samples of client documents to be used in fraudulent transactions.  MM stated that PIERCE warned him that their clients were never to contact Bank 1, and that if they attempted to contact Bank 1 directly, PIERCE would cancel the deals.  PIERCE also forbade MM from contacting Bank 1 directly.

Victim B

24.     FBI agents interviewed Victim B about his interactions with MM.[4]  In early May 2013, Victim B and his business associate decided to purchase gold, which they then planned to re-sell for a profit.  In the process of trying to identify a source of financing for his planned gold purchase, an intermediary introduced Victim B to MM as someone who could provide letters of credit from Bank 1, which Victim B could use to secure financing.

25.     During a telephone conversation, MM told Victim B that MM had a business relationship with Bank 1 and that MM could use this relationship to secure a standby letter of credit for Victim B.  On or about May 11, 2013, which was approximately a week after this phone call, MM e-mailed a draft Joint Venture (JV) Agreement to Victim B.

26.     Additionally, MM attached a document to the May 11, 2013 email representing that if Victim B paid $160,000 to an escrow account identified by MM, MM would arrange for Bank 1 to issue a SWIFT message to a bank identified by Company B confirming that Company B was entitled to draw on $1.5 million in funds held by MM's Company at Bank 1.

27.     Based on the information that MM provided to Victim B – including the draft SBLC – Victim B believed that MM had the ability to cause Bank 1 to issue an SBLC in the

---

[4] Victim B stated that he had no direct contact with PIERCE in connection with these transactions.

amount of $1.5 million.  The FBI interviewed a representative of Bank 1 who confirmed that
neither PIERCE nor MM held accounts at Bank 1 or worked at Bank 1.  Thus, PIERCE and MM
did not have the authority to cause Bank 1 to issue SBLC's.  On or about May 15, 2013, Victim
B's business associate caused $160,000 to be wired into the escrow account provided by MM.

28.     MM stated to a Special Agent that PIERCE provided the false Bank 1
documentation to MM that MM gave to Victim B and Victim C (as described in more detail
below).  A review of emails from MM's email account identified an email exchange that
occurred on the afternoon of May 16, 2013 in which MM emailed PIERCE.  This email
corroborates that MM relied upon PIERCE to obtain the false bank documentation from Bank 1.
In the e-mail, MM requested that PIERCE cause Bank 1 to "issue" an SBLC in the amount of
$1.5 million to Victim B's bank the following day.  MM also noted in the e-mail that PIERCE
had previously provided the "verbiage" of the Bank 1 documentation to MM, which MM
requested stay the same.

29.     After PIERCE caused the purported Bank 1 documentation to be sent to MM[5],
MM emailed Victim B a document on May 17, 2013 that purported to be a SWIFT message from
Bank 1 issuing an SBLC on behalf of its client, MM's Company.  MM also emailed Victim B a
document purporting to be a "delivery notification" for the letter of credit, which MM described
as a "Proof of Delievry [sic]" to Victim B's bank.  The purported SBLC that MM provided to
Victim B was fraudulent for a number of reasons.  First, a representative of Bank 1 confirmed

---

[5] PIERCE caused the documents to be sent to MM from what appeared to be an e-mail account at
Bank 1.  MM stated that PIERCE also provided him with copies of the documents via Skype, an
internet communication service.  With respect to the Bank 1 e-mail account, the FBI interviewed
the Bank 1 e-mail account holder and she stated that she did not understand English, and first
noticed in May 2013 that her account was sending and receiving emails that she had not sent.
She later requested that Bank 1 change her e-mail account.  She also stated that she did not know
PIERCE or CC-1.

that Bank 1 did not issue it.  Second, a representative of Bank 1 confirmed to the FBI that Bank 1

did not transmit SBLC's by SWIFT message.  Further, the purported SBLC identified MM's

Company as having an account at Bank 1, which a representative of Bank 1 told the FBI is not

the case.  Moreover, the "Proof of Delivery" is false because, although the document represented

that Victim B's bank received the document, Victim B has confirmed to a Special Agent that his

bank never received the document.  Bank 1 also confirmed that the document was not generated

by SWIFT.

30.     On or about May 17, 2013, the escrow agent distributed the $160,000 that Victim

B's business associate had previously transferred to it.  The escrow agent released $100,000 to a

Costa Rican bank account in the name of a business controlled by PIERCE, and released $50,000

to MM.

31.     On or about May 21, 2013, Victim B informed MM that Victim B's bank had not

been able to confirm receipt of the purported SBLC from Bank 1.  Indeed, Victim B has

informed a Special Agent that his bank never received the purported SBLC.  MM then requested

that Victim B pay him an additional $75,000 for MM to "re-issue" the document.

32.     Between on or about May 21, 2013 and on or about June 6, 2013, MM and Victim

B communicated with respect to the fee MM required to re-issue the SBLC, the bank to which

the re-issued SBLC would be sent, and its amount.  Ultimately, Victim B agreed to pay $75,000

for the "re-issued" SBLC, with $20,000 paid up front, and the balance to be paid after Victim B

confirmed transmission of the SBLC to a second account located at a bank in the Bahamas.  On

June 6, 2013, Victim B transferred $20,000 from his Company B account directly to MM's bank

account.  On June 20, 2013, MM transferred $30,000 from his Citibank account to a Bank of

America account in the name of a company controlled by PIERCE.  Also on June 20, 2013,

PIERCE transferred $20,000 to a bank account in the name of a company controlled by CC-1.

33.     Despite paying MM an additional $20,000, Victim B never received the SBLC at

the second bank in the Bahamas.  On June 20, 2013, MM e-mailed Victim B that Bank 1 had

finally sent the SBLC to Victim B's bank in the Bahamas, and attached a copy of the purported

SWIFT message transmitting the SBLC in the amount of $1.5 million as well as the delivery

confirmation from the receiving bank.  As with the first set of documents, MM obtained these

documents through PIERCE.  The FBI's investigation has found an e-mail that MM sent to

PIERCE requesting the documents, and MM has confirmed that he obtained the Bank 1

documents through PIERCE.

34.     Again, both of these documents were false.  A representative of Bank 1 confirmed

that it did not issue the SBLC, and that the delivery confirmation was not generated by SWIFT.

The SBLC again stated that Bank 1 was issuing the SBLC on behalf of its client, MM's

Company, and listed a Bank 1 account number for MM's Company, but MM's Company did not

have an account with Bank 1.  The SBLC also stated that it was purportedly authorized by two

Bank 1 employees, but a representative of Bank 1 confirmed that neither of the employee

numbers listed were valid Bank 1 employee identification numbers.  With respect to the delivery

confirmation, it purported to show that the bank in the Bahamas designated by Victim B received

the standby letter of credit, but Victim B has confirmed that the bank in the Bahamas never

received the SBLC.

35.     On July 17, 2013, MM wrote to Victim B that "his investor" (*i.e.*, PIERCE) had

"put all existing business affairs on hold including re-sending of the swift until the result of the

bank investigation for the missing [SBLC] sent to [Victim B's bank in the Bahamas] is resolved

in the next few days," and MM also acknowledged to Victim B that they had been accused by Victim B's bank in the Bahamas of providing fraudulent documents.

36.     Ultimately, Bank 1 never transmitted an SBLC to any of the banks designated by Victim B.  In total, Victim B and his business associate lost $180,000 that they transferred to accounts designated by MM.

Victim C

37.     FBI agents interviewed Victim C about his interactions with MM.[6]  In 2013, Victim C identified a business opportunity to purchase diesel fuel from a refiner in Russia and deliver the oil product for sale to a third party.  In order to finance the transaction, Victim C needed to demonstrate that he had access to $33.5 million.

38.     On or about June 14, 2013, Victim C met MM in Washington D.C.  Over the course of several discussions, MM told Victim C that MM represented MM's Company, a fuel trading company based in London, which had millions of dollars on deposit at Bank 1.  As stated above, representatives of Bank 1 confirmed that neither MM's Company nor MM had a bank account with Bank 1.

39.     On or about June 18, 2013, Victim C and MM executed a Joint Venture Agreement and Trust Instructions.  The stated purpose of these documents was for MM's Company to cause Bank 1 to issue a SWIFT MT-799 in exchange for a fee.  Bank 1 would issue the SWIFT MT-799 to a bank account identified by Company C's (Victim C's entity) oil supplier.  The MT-799 would be a "blocked funds letter," which would confirm that Bank 1 had placed a 90-day hold on funds that Company C held at Bank 1 in favor of Company C's oil

---

[6] Victim C stated that he had no direct contact with PIERCE in connection with these transactions.

supplier.  The oil supplier could then rely on that assurance to enter into a large sale of oil to

Company C.  In return, Victim C would make an initial payment of $133,750.

40.     On June 18, 2013, per the terms of the Trust Instructions, Victim C wired

$143,750 to the escrow agent for the transaction, which consisted of a $133,750 payment and a

$10,000 escrow fee.  On or about June 21, 2013, Victim C was informed that due to an increased

bank fee, he needed to pay an additional $83,750 in order for Bank 1 to complete the

transmission of the blocked funds letter.  Victim C then wired $83,750 to the Escrow Agent on

June 24, 2013.

41.     On or about June 19, 2013, MM e-mailed PIERCE to request the purported Bank

1 documentation for Victim C's blocked funds letter, which MM received on or about June 25,

2013.  Later that same day, MM forwarded the documents to Victim C, which were false.  MM

sent Victim C a purported blocked funds letter that Bank 1 had transmitted to the bank of

Company C's oil supplier showing that Victim C had $33.5 million in funds available at Bank 1,

as well as a purported delivery confirmation message confirming that the bank of Company C's

oil supplier had received the blocked funds letter.  A representative of Bank 1 confirmed that the

blocked funds letter was false, and Victim C informed a Special Agent that the bank of Company

C's oil supplier never received the blocked funds letter.

42.     That same day, MM emailed the purported blocked funds letter to the escrow

agent, who then released the $217,500 to accounts controlled by MM and PIERCE, of which

$150,000 went to a Bank of America account in the name of a company controlled by PIERCE.

On June 26, 2013, PIERCE transferred $80,000 to a bank account in the name of a company

controlled by CC-1.

43.     By July 1, 2013, Victim C was still unable to confirm that the bank of Company

C's oil supplier had received the blocked funds letter from Bank 1.  On July 3, 2013, MM

forwarded to Victim C a message that MM claimed was Bank 1's confirmation that it had sent

the blocked funds letter to the bank of Company C's oil supplier.  Despite this purported

confirmation that the blocked funds letter was sent, Victim C stated to a Special Agent that the

bank of Company C's oil supplier did not receive the blocked funds letter.

44.     On July 22, 2013, MM told Victim C that Bank 1 could "re-issue" the blocked

funds letter through a second bank if Victim C paid an additional large fee.  Victim C agreed to

wire the additional money directly to MM.  On July 29, 2013, Victim C wired an additional

$167,500 directly to MM's account.  On July 29, 2013, MM also e-mailed PIERCE to request

additional purported Bank 1 documentation for Victim C.

45.     On August 1, 2013, MM transferred $50,000 from his Citibank account that he

had received from Victim C to PIERCE's bank account at Bank of America, thus causing an

interstate wire to be sent from the District of Columbia.  MM confirmed that he initiated this

wire transfer request from a Citibank location in Washington D.C., and a representative of

Citibank confirmed that Citibank wire transfers were routed outside of the District.  On August

1, 2013, PIERCE made additional transfers to a bank account in the name of a company

controlled by CC-1.

46.     On August 1, 2013, PIERCE caused an e-mail to be sent to MM with Victim C's

purported Bank 1 documentation.  MM confirmed that he received the e-mail in the District of

Columbia, which was an interstate wire communication.  MM then e-mailed Victim C the

documentation, which MM stated to Victim C was a copy of the blocked funds letter that Bank 1

transmitted through the second bank.  A Special Agent spoke with a representative of the second

14

bank who confirmed that this document was false, and that the second bank never received the SWIFT message in question.  A representative of Bank 1 also confirmed that the document was false.

47.     On August 8, 2013, Victim C e-mailed MM that the blocked funds letter that Bank 1 had purportedly sent through the second bank was still missing, and that Victim C was planning on escalating the matter to the relevant authorities.  MM forwarded this e-mail to PIERCE, and stated that if the blocked funds letter did not arrive that MM and PIERCE would "be in deep SHIT with the Law Enforcement Authorities in USA and as well as INTERPOL, and the ratifications (*sic*) will be beyond our imaginations."

48.     On August 15, 2013, Victim C e-mailed further regarding the initial blocked funds letter that Bank 1 purportedly sent on June 24, 2013.  Victim C stated that an employee of Bank 1 advised that the purported blocked funds letter that MM provided was false and that Victim C was planning to contact the authorities.  In response, MM asked PIERCE in an email to perform "damage control" with his contacts at Bank 1 to "nullify" the Bank 1 employee's claim. MM also said that if there was nothing that PIERCE's contacts could do to "nullify" this claim, to try to re-issue the blocked funds letter using a different method of communication between the banks "in order to keep [Victim C] happy, so that he can stop proceeding with his investigation."

49.     MM and PIERCE spoke that day.  According to MM, PIERCE insisted that Victim C should not contact Bank 1 directly.  MM then e-mailed Victim C and stated that under the terms of their agreement, Company C could lose all the fees that it had paid by contacting Bank 1 directly.

50.     Ultimately, Bank 1 never issued a blocked funds letter to any of Victim C's designated banks.  In total, Victim C wired approximately $395,000 to accounts designated by

MM.  The escrow agent returned to Victim C the $10,000 escrow fee he paid.  No other funds

were returned to Victim C.

Additional Victims

51.     Following the events described above, on September 27, 2013, MM e-mailed

PIERCE and stated that he had found another individual interested in obtaining an SBLC from

Bank 1, and that the individual might be able to refer additional people to them as well.  On

October 2, 2013, MM sent another e-mail to PIERCE, seeking confirmation that the terms of the

individual's proposed SBLC were acceptable.

**CONCLUSION**

52.     Based on my training and experience and the facts as set forth in this affidavit,

there is probable cause to believe that from at least in or about February 2011 until in or about

October 2013, PIERCE knowingly and willfully engaged in a conspiracy to commit wire fraud in

violation of Title 18, United States Code, Section 1343; that is, having devised and intending to

devise a scheme and artifice to defraud and to make materially false and fraudulent

representations, and for the purpose of executing that scheme, transmitted and caused to be

transmitted certain wires in interstate commerce, all in violation of Title 18, United States Code,

Section 371.  This conspiracy to violate Title 18, United States Code, Section 1343 took place in

part within the District of Columbia.

53.     Based on the foregoing, your affiant respectfully submits that there is probable

cause to believe that JAMES PIERCE has violated Title 18, United States Code, Section 371

(Conspiracy to Commit Wire Fraud), and therefore, a warrant should issue for his arrest.

Because public filing of this document could result in a risk of flight by the defendant, as well as

jeopardize the government's ongoing investigation, your affiant respectfully requests that this

16

complaint, as well as any arrest warrants issued in connection with this complaint, be filed under

seal.

_____
Special Agent Gregory S. Fine
Federal Bureau of Investigation

Sworn to and subscribed before me on the _____ day of July 2018


_____
Honorable Deborah A. Robinson
United States Magistrate Judge