

FILED
OCT 30 2019
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL NO. 18-CR-230 |
| v. | : | |
| | : | |
| JAMES PIERCE | : | |
| | : | |
| Defendant. | : | |

### AGREED STATEMENT OF OFFENSE

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the Defendant, James Pierce ("Pierce" or the "Defendant"), and the United States agree to and stipulate as follows:

1.  From in or around February 2011 through in or around October 2013, the Defendant knowingly and willingly conspired to commit wire fraud (18 U.S.C. § 1343), in violation of 18 U.S.C. § 1349. He knowingly and willingly entered into an agreement to commit wire fraud, and he knowingly and willingly participated in the conspiracy with the intent to commit wire fraud. The Defendant also committed wire fraud (18 U.S.C. § 1343). He knowingly and willfully participated in a scheme to defraud, with knowledge of its fraudulent nature and with specific intent to defraud, and in the execution of that scheme he caused the use of interstate wires as set forth in Paragraphs 25 and 26 below.

2.  Pierce, together with his co-conspirators, defrauded victims by telling them that, in exchange for an upfront payment, the co-conspirators would arrange for Bank 1 to issue SWIFT messages[1] showing that the victims had access to funds on deposit at Bank 1. As part of their pitch and at Pierce's direction, the co-conspirators represented that they had access to funds at Bank 1.

---

[1]  The Society for Worldwide Interbank Financial Telecommunication ("SWIFT") is the world's leading provider of secure financial messaging services. It is a network enabling

1

3. In fact, Pierce and his co-conspirators neither controlled accounts at Bank 1 nor had the ability to cause Bank 1 to issue the SWIFT messages they promised to the victims. Instead, Pierce and his co-conspirators provided victims with fake SWIFT messages that purported to show that Bank 1 had issued SWIFT messages as promised. After the victims confronted Pierce and his co-conspirators, who had failed to follow through on their promises, Pierce and his co-conspirators offered a number of excuses and false statements, including that Bank 1 had in fact sent the SWIFT messages and that the receiving banks had confirmed their receipt. Pierce and his co-conspirators also attempted to discourage the victims from contacting Bank 1 directly, in order to conceal the conspiracy.

### Victim A

4. In or around February 2011, Broker A represented to Victim A that Victim A could earn a substantial fee from participating in the issuance of a standby letter of credit[2] ("SBLC") to a third party that needed financing to engage in trading. Broker A represented that by making a $350,000 payment to CC-1, whom Broker A represented would serve as the escrow agent for the transaction, Victim A could cause Bank 1 to transmit an SBLC by SWIFT message to a bank of the third party, which the third party could use to obtain financing.

5. Victim A made the $350,000 payment to CC-1. Broker A then provided Victim A with a copy of what Broker A represented to be a copy of the SWIFT message that Bank 1

---

financial institutions worldwide to send and receive information about financial transactions in a secure, standardized and reliable environment.

[2] An SBLC is a guarantee of payment issued by a bank on behalf of a client. SBLCs are created as a sign of good faith in business transaction and are proof of a buyer's credit quality and repayment abilities.

transmitted to the third party's bank. In fact, the purported Bank 1 documentation was fraudulent.

6. Victim A did not receive confirmation from the bank of the third party that it had received the SWIFT message transmitting the SBLC. Pierce then contacted Victim A. Pierce falsely told Victim A that Victim A should bypass Broker A and speak directly with Pierce because Pierce was the person who had direct contact with Bank 1. Further, Pierce falsely maintained that Bank 1 had transmitted the SBLC and that any mistake with the transaction must be due to the failure of the third party's bank.

7. On or about June 23, 2011, Pierce forwarded Victim A a copy of an additional purported SWIFT message that Bank 1 had sent to the third party's bank in reference to the earlier purported Bank 1 SWIFT message. This SWIFT message was also fraudulent.

8. Victim A later reported the purported escrow agent CC-1 to the Florida Bar for the unauthorized practice of law. On or about October 18, 2013, Pierce sent Victim A a draft affidavit in which Pierce attempted to have Victim A release CC-1 from Victim A's claims with the Florida Bar. Later, after the Florida Bar interviewed CC-1, on or about November 22, 2013, Victim A received a refund of his payment.

## MM

9. Pierce recruited co-conspirator MM into the fraudulent scheme in 2012. Pierce and MM reached an arrangement in which MM would solicit new "clients," and Pierce would provide the purported Bank 1 documentation to MM to give to them. MM would charge a victim client a fee for each Bank 1 "transaction." Pierce and MM shared that fee, and MM sent a portion of the victim money to bank accounts controlled by Pierce in Florida and Costa Rica. Pierce then transferred a portion of the victim money to a bank account controlled by CC-1.

10. Pierce instructed MM on how to prepare documents for the fraudulent transactions, and provided him with samples of client documents to be used in fraudulent transactions. Pierce warned him that their clients were never to contact Bank 1, and that if they attempted to contact Bank 1 directly, Pierce would cancel the deals.

## Victim B

11. In early May 2013, Victim B and his business associate decided to purchase gold, which they then planned to re-sell for a profit. In the process of trying to identify a source of financing for his planned gold purchase, an intermediary introduced Victim B to MM as someone who could provide letters of credit from Bank 1, which Victim B could use to secure financing.

12. MM falsely represented to Victim B that MM had a business relationship with Bank 1 and that MM could use this relationship to secure a standby letter of credit for Victim B. MM represented that if Victim B paid $160,000 to an escrow account identified by MM, in exchange MM would arrange for Bank 1 to issue a SWIFT message to a bank identified by Company B confirming that Company B was entitled to draw on $1.5 million in funds held by MM's Company at Bank 1. On or about May 15, 2013, Victim B's business associate caused $160,000 to be wired into the escrow account provided by MM.

13. Pierce provided the false Bank 1 documentation for MM to give to Victim B. On May 16, 2013, MM e-mailed Pierce to request that Pierce cause Bank 1 to "issue" an SBLC in the amount of $1.5 million to Victim B's bank the following day. MM also noted in the e-mail that Pierce had previously provided the "verbiage" of the Bank 1 documentation to MM, which MM requested stay the same.

14. After Pierce caused the purported Bank 1 documentation to be sent to MM, MM provided the false documentation to Victim B. On or about May 17, 2013, the escrow agent distributed the $160,000 that Victim B's business associate had previously transferred to it. The escrow agent released $100,000 to a Costa Rican bank account in the name of a business controlled by Pierce, and released $50,000 to MM.

15. On or about May 21, 2013, Victim B informed MM that Victim B's bank had not been able to confirm receipt of the purported SBLC from Bank 1. MM then requested that Victim B pay him an additional fee for MM to "re-issue" the document to a second receiving bank.

16. On June 6, 2013, Victim B transferred $20,000 from his Company B account directly to MM's bank account. On June 20, 2013, MM transferred $30,000 from his Citibank account to a Bank of America account in the name of a company controlled by Pierce. Also on June 20, 2013, Pierce transferred $20,000 to a bank account in the name of a company controlled by CC-1.

17. Despite paying MM an additional $20,000, Victim B never received the SBLC at the second receiving bank. Instead, MM obtained a second set of false Bank 1 documents through Pierce, and on June 20, 2013 MM falsely told Victim B that Bank 1 had finally sent the SBLC to the second receiving bank. MM also provided Victim B with a copy of the false Bank 1 documents: i) a false SWIFT message from Bank 1 that appeared to show Bank 1 transmitting the SBLC in the amount of $1.5 million; and ii) a false delivery confirmation from the receiving bank.

18. Ultimately, Bank 1 never transmitted an SBLC to any of the banks designated by Victim B. In total, Victim B and his business associate lost $180,000.

### Victim C

19.  In 2013, Victim C identified a business opportunity to purchase diesel fuel from a refiner in Russia and deliver the oil product for sale to a third party. In order to finance the transaction, Victim C needed to demonstrate that he had access to $33.5 million.

20.  On or about June 18, 2013, Victim C and MM executed a Joint Venture Agreement and Trust Instructions. The stated purpose of these documents was for MM's Company to cause Bank 1 to issue a SWIFT message in exchange for a fee. Bank 1 would issue the SWIFT message to a bank account identified by Company C's (Victim C's entity) oil supplier. The SWIFT message would be a "blocked funds letter," which would confirm that Bank 1 had placed a 90-day hold on funds that Company C held at Bank 1 in favor of Company C's oil supplier.

21.  On June 18, 2013, per the terms of the Trust Instructions, Victim C wired $143,750 to the escrow agent for the transaction, which consisted of a $133,750 payment and a $10,000 escrow fee. On or about June 24, 2013, Victim C made an additional payment of $83,750 to the escrow agent.

22.  On or about June 19, 2013, MM e-mailed Pierce to request the false Bank 1 documentation for Victim C's blocked funds letter, which MM received on or about June 25, 2013. Later that same day, MM forwarded the false documents to Victim C. These included: i) a false Bank 1 blocked funds letter that appeared to have been transmitted from Bank 1 to the bank of Company C's oil supplier showing that Victim C had $33.5 million in funds available at Bank 1; and ii) a false delivery confirmation message appearing to confirm that the bank of Company C's oil supplier had received the blocked funds letter.

23.     That same day, MM emailed the false blocked funds letter to the escrow agent, who then released the $217,500 to accounts controlled by MM and Pierce, of which $150,000 went to a Bank of America account in the name of a company controlled by Pierce. On June 26, 2013, PIERCE transferred $80,000 to a bank account in the name of a company controlled by CC-1.

24.     After Victim C could not confirm that the bank of Company C's oil supplier had received the blocked funds letter from Bank 1, MM told Victim C that Bank 1 could "re-issue" the blocked funds letter through a second bank if Victim C paid an additional large fee. On July 29, 2013, Victim C wired an additional $167,500 directly to MM's account. On July 29, 2013, MM also e-mailed Pierce to request additional false Bank 1 documentation for Victim C.

25.     On August 1, 2013 at a Citibank location in Washington D.C., MM transferred $50,000 from his Citibank account that he had received from Victim C to PIERCE's bank account at Bank of America, thus causing an interstate wire transmission to be sent from the District of Columbia. On August 1, 2013, Pierce made additional transfers to a bank account in the name of a company controlled by CC-1.

26.     On August 1, 2013, PIERCE caused an interstate wire communication to be sent to MM in the District of Columbia with Victim C's purported Bank 1 documentation. MM then e-mailed Victim C the documentation, which MM falsely stated to Victim C was a copy of the blocked funds letter that Bank 1 transmitted through the second bank.

27.     On August 8, 2013, Victim C e-mailed MM that the blocked funds letter that Bank 1 had purportedly sent through the second bank was still missing, and that Victim C was planning on escalating the matter to the relevant authorities. MM forwarded this e-mail to Pierce, and stated that if the blocked funds letter did not arrive that MM and Pierce would "be in

deep S*** with the Law Enforcement Authorities in USA and as well as INTERPOL, and the ratifications (*sic*) will be beyond our imaginations."

28.   On August 15, 2013, Victim C e-mailed further regarding the initial blocked funds letter that Bank 1 purportedly sent on June 24, 2013. Victim C stated that an employee of Bank 1 advised that the purported blocked funds letter that MM provided was false and that Victim C was planning to contact the authorities. In response, MM asked Pierce in an email to perform "damage control" with his contacts at Bank 1 to "nullify" the Bank 1 employee's claim. MM also said that if there was nothing that Pierce's contacts could do to "nullify" this claim, to try to re-issue the blocked funds letter using a different method of communication between the banks "in order to keep [Victim C] happy, so that he can stop proceeding with his investigation."

29.   MM and Pierce spoke that day. Pierce insisted to MM that Victim C should not contact Bank 1 directly. MM then e-mailed Victim C and stated that under the terms of their agreement, Company C could lose all the fees that it had paid by contacting Bank 1 directly.

30.   Ultimately, Bank 1 never issued a blocked funds letter to any of Victim C's designated banks. In total, Victim C wired approximately $395,000 to accounts designated by MM. The escrow agent returned to Victim C the $10,000 escrow fee he paid. No other funds were returned to Victim C.

## Additional Victims

31.   Following the events described above, on September 27, 2013, MM e-mailed Pierce and stated that he had found another individual interested in obtaining an SBLC from Bank 1, and that the individual might be able to refer additional people to them as well. On October 2, 2013, MM sent another e-mail to Pierce, seeking confirmation that the terms of the individual's proposed SBLC were acceptable.

32. The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charges against me. It does not include all of the facts known to me concerning criminal activity in which I and others engaged. I make this statement knowingly and voluntarily and because I am in fact guilty of the crimes charged.

DATE: 10/29/2019

_____
JAMES PIERCE
Defendant

_____
DAN COGDELL
Attorney for the Defendant

_____
BLAKE GOEBEL
Trial Attorney
Fraud Section, Criminal Division
United States Department of Justice